**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 24, 2017
Decided April 3, 2017

**Before**

WILLIAM J. BAUER, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 16-2275

| | |
|---|---|
| FRANK E. LLOYD, JR., <br>     *Plaintiff-Appellant*, <br><br> *v.* <br><br> NANCY A. BERRYHILL, <br> Acting Commissioner of Social Security, <br>     *Defendant-Appellee*. | Appeal from the United States District Court for the Northern District of Indiana, South Bend Division. <br><br> No. 3:14-cv-02027-JVB-CAN <br><br> Joseph S. Van Bokkelen, <br> *Judge*. |

**O R D E R**

In December 2011, eight years after falling off a ladder and shattering his left heel, Frank Lloyd, Jr., then 52, applied for Disability Insurance Benefits and Supplemental Security Income. An administrative law judge rejected his claim, and that decision was upheld by the Appeals Council and the district court. Lloyd now challenges the decision as being not supported by substantial evidence, but we disagree and uphold the denial of benefits.

After his fall in 2003, Lloyd had reconstructive surgery on his heel, but never fully recovered. The pain worsened over time, causing him to have trouble working at various labor-intensive jobs (i.e., as a welder), so Lloyd stopped work in 2007. His

difficulties compounded in 2009, when he suffered a collapsed lung after a car accident and skin burns from a fire; both injuries healed but left him with occasional pain.

Lloyd saw his primary-care doctor several times in early 2010 (the earliest visits reflected in the record) for his skin burns and leg pain. In January, Dr. Charles Heinsen noted that Lloyd's second-degree burns on his shoulders and hand were healing well. Then in March, Lloyd complained of pain in his left leg. At that time his leg was very tender but he had good pulses in his foot. Heinsen diagnosed him with a blood clot and prescribed anti-inflammatory medication.

Also in March, in connection with his application for state-disability benefits, Dr. Mohamad Mokadem examined Lloyd and observed that he had mild physical limitations. Lloyd had diminished pulses and limited flexibility because of pain and some stiffness in his left foot. Notwithstanding these findings, Mokadem found that Lloyd's posture and gait were normal, that he could stand on his heels and toes, and that he could squat and stand up afterwards. Mokadem also noticed signs of enlarged veins in his left calf that suggested a possible blood-flow deficiency. Mokadem concluded that Lloyd's ailments were three-fold: he had (1) left-heel pain because of his previous fracture (Lloyd complained of "significant pain in his left heel upon standing up for a period longer than 5 to 10 minutes"); (2) occasional chest pain from a previously collapsed lung; and (3) burns that were healing well.

In April, Dr. Heinsen sent Lloyd to the emergency room for a possible heart attack, but the doctors ruled one out because he had clear breathing and a normal chest x-ray. They diagnosed him instead with a "vasovagal episode" (fainting caused by a sudden decrease in heart rate and blood pressure).

In August 2010, Dr. Heinsen filled out a questionnaire about Lloyd's residual functional capacity and reported that he was significantly limited in almost every category. But Heinsen's notes accompanying his examination were unremarkable: Lloyd's respiratory and cardiovascular exams were normal, as was his gait and stance, though he did have pain and tenderness in his left leg.

In January 2012, Dr. Randell Coulter, an examining agency doctor, opined that Lloyd could carry 10 pounds occasionally and stand and walk for 2 hours in an 8-hour day, meaning that he could perform sedentary work. Lloyd's cardiovascular exam was normal and Coulter saw no enlarged veins or swelling. Coulter diagnosed Lloyd first with chronic shortness of breath, noting that upon examination he had diminished

breath sounds and a prolonged exhale, but no labored breathing. Next Coulter concluded that Lloyd had chronic left-heel pain that could cause problems with prolonged standing, walking, or climbing, and performing exertional work. Aside from self-reported pain when walking, Lloyd had a normal gait and his range of motion in all extremities and muscle strength were normal.

In February 2012, Lloyd returned to the emergency room with sharp chest pain. Despite the reported pain, his chest x-ray was normal, and he was discharged in stable condition within a few hours.

Later that month Lloyd underwent several state-requested tests. His spirometry, or lung-function test, revealed that the ratio of his exhalation in one second (called forced expiratory volume) to his total exhalation (called forced vital capacity) was 69% (according to Dr. Jilhewar, the independent medical expert who testified at Lloyd's hearing, a ratio below 70% was abnormal). His left foot and ankle x-rays showed post-surgical changes in his heel bone (a metal plate and screws along with a healed fracture) and minor osteoarthritis in his second toe, but no new fractures, dislocations, or changes were apparent.

In March 2012, Dr. J.V. Corcoran, a non-examining agency doctor, found that Lloyd's physical limitations were less severe than what the examining doctors had identified. Corcoran said that Lloyd could occasionally lift 50 pounds and frequently lift 25, could sit and stand or walk for 6 hours in a workday, should avoid concentrated exposure to fumes, and had no postural limitations. These conclusions were supported by several objective findings: (1) Lloyd's left foot x-rays showed mild arthritis but no other degenerative changes; (2) Dr. Coulter's exam revealed normal gait and range of motion, but prolonged breathing; and (3) Lloyd's chest x-ray and lung-test results were normal.

Despite not seeing Lloyd for nearly two years, Dr. Heinsen in May 2012 completed another residual functional capacity questionnaire, diagnosing Lloyd with angina and chronic lung disease. He opined that Lloyd could walk only 1 or 2 city blocks at a time, sit for 2 hours or stand for 1 at a time, sit or stand and walk for less than 2 hours total in an 8-hour workday, carry 20 pounds occasionally, and reach overhead for 10% of a workday.

Lloyd saw Dr. Heinsen again in November 2012 for pain in his knees and elbows as well as difficulty walking. His physical exam was normal. Heinsen prescribed an

osteoarthritis medication, an anti-inflammatory for his pain, and a blood thinner for his clotting issues.

In spring 2013, Lloyd repeatedly sought treatment for blood clots in his leg. First he went to the emergency room because of pain in his right calf. His leg was tender, swollen, and showed signs of a possible blood clot, which a Doppler ultrasound confirmed. Lloyd spent three days in the hospital while the doctors gave him pain and blood-thinner medication and monitored his condition. When discharged, he was told to continue taking the medication.

By May 2013, Dr. Heinsen had lowered his assessment of Lloyd's condition, characterizing it in an RFC questionnaire as "totally and permanently disabled." He could walk half of a city block without pain, sit for 30 minutes and stand for 15 at one time, sit for less than 2 hours in a workday, stand or walk also for less than 2 hours total, rarely lift 10 pounds, reach overhead 5% of the time, and never twist, bend, crouch, or climb. His job accommodations would be many: Lloyd needed to change positions at will, walk around every 30 minutes for 10 minutes each, and always keep his leg elevated. But during the physical exam, Lloyd had normal respiratory and cardiovascular exams as well as normal gait and station, though he occasionally needed to use a cane or walker. Heinsen identified only two clinical findings that supported his diagnoses—the recent Doppler exam and the earlier lung-function test.

Just five days later, Lloyd returned to the emergency room because he had stopped taking his blood-thinner medication and had pain and swelling in his right leg. He resumed taking the medication and within a few days was discharged in stable condition.

An ALJ held a hearing 2013 and heard testimony by Lloyd, who reasserted his complaints of pain in both legs and severe chest pain, and by Dr. Ashok Jilhewar, a gastroenterologist whom the ALJ had called as an independent medical expert. Jilhewar testified that Lloyd could perform light work. In his view, reports of limited flexibility supported a left-heel injury but the subjective pain complaints could not be explained by the clinical findings because his foot x-rays did not show any degenerative changes. Jilhewar also said Lloyd had a "minimal obstructive lung disease," supported by the slightly abnormal lung test result, with otherwise normal results and unremarkable chest x-rays. Lastly Jilhewar disagreed that Lloyd had peripheral artery disease because the Doppler ultrasound had documented only a blood clot and not larger arterial problems. Additionally weak pulses in his foot were reported only in a single physical

exam. Finally a vocational expert testified that an individual who could perform light work, subject to some postural and skill limitations identified by the ALJ, could work as a hand-sorter, assembler, or hand-packer.

One month later the ALJ found Lloyd not disabled and denied his request for benefits. Applying the 5-step analysis for assessing disability, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), the ALJ found that Lloyd had not engaged in substantial gainful activity since November 2007 (Step 1); that Lloyd's left-heel injury and chronic obstructive pulmonary disease were severe impairments (Step 2); that his impairments did not meet or equal a listed impairment (Step 3); that he could no longer work as a welder (Step 4); and that he could still work as a hand-sorter, assembler, or hand-packer (Step 5). With respect to Step 3, the ALJ considered whether Lloyd's impairments met Listing 1.02, involving major dysfunction of a joint that causes an inability to walk effectively, but concluded that it was not met because he had normal gait when examined.

The ALJ credited Dr. Jilhewar's assessment over that of the treating physician, Dr. Heinsen. She gave only minimal weight to Heinsen's opinion because it relied too heavily on subjective complaints. For example, Heinsen credited Lloyd's complaints of left-heel pain over his foot x-ray and Heinsen's own reports of normal gait. She gave considerable weight, however, to Jilhewar's assessment, which focused on the objective findings, including x-rays and physical exams. The ALJ also assigned "weight" to Dr. Corcoran's assessment that Lloyd could do medium work because it had a "reasonable basis" in the record. Finally the ALJ gave Dr. Coulter's opinion little weight because his opinion about Lloyd's capacity to lift and carry was inconsistent with his finding that Lloyd's strength was normal.

The ALJ concluded that Lloyd could perform light work, subject to some postural limitations. She thought that Lloyd's leg and heel pain warranted an "occasional" restriction on postural limitations, including climbing, and that his lung disease limited him to occasional exposure to cold and heat and other pulmonary irritants. Lastly she limited Lloyd to unskilled, repetitive jobs with only occasional contact with the public and co-workers.

On appeal Lloyd first asserts that the ALJ erred at Step 3 by not considering whether he met Listing 1.03, which requires reconstructive surgery of a "major weight-bearing joint, with inability to ambulate effectively." *See* 20 C.F.R., pt. 404, subpt. P, app. 1 at § 1.03. Lloyd believes he met this listing because Drs. Coulter and

Heinsen opined that he would struggle with "prolonged ambulation" and could walk only "a half a block or less without severe pain," which the ALJ ignored when she considered a related listing. We agree that the ALJ erred by omitting discussion of Listing 1.03, but any error was harmless. The ALJ already had concluded during her evaluation of Listing 1.02 that one of the listings' shared criteria was not met. An impairment "must meet *all* of the specified criteria" for it to meet a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see also Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). Lloyd needed to show, for example, an inability to walk at a reasonable pace for a block over uneven surfaces or without using two canes or two crutches. *See* 20 C.F.R., pt. 404, subpt. P, app. 1 at § 1.00B2b(2). But Lloyd did not make such a showing, and the ALJ pointed to a January 2012 examination at which Lloyd's gait was grossly normal. When determining the RFC at Step 5, the ALJ discussed Drs. Coulter's and Heinsen's opinions and concluded that they were inconsistent with the objective evidence. She also identified two other exams at which Lloyd had normal gait. Thus her later discussion supported her determination that Listing 1.02 was not met; she did not need to repeat herself when considering the listing. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015). Moreover, because any discussion of Listing 1.03 would involve the same evidence and ultimate conclusion, the omission was harmless.

Relatedly, Lloyd says that the ALJ also erred in not considering Listing 4.12, which covers peripheral arterial disease. *See* 20 C.F.R., pt. 404, subpt. P, app. 1 at § 4.12. The ALJ should have addressed the applicability of this listing, but this oversight too was harmless. Lloyd cannot show that he satisfied the listing because one of its criteria is that the claimant suffers from low blood pressure in an ankle or toe, and Lloyd never underwent any testing to measure his blood pressure in his ankle or toe.

Next Lloyd—in only general terms—challenges the ALJ's weighing of every medical opinion in the record. His argument is sprawling, but he essentially disputes the ALJ's decision to give only minimal weight to Dr. Heinsen's opinions, which, he maintains, is not supported by objective evidence. But that is not the case here. While a treating physician's opinion is usually entitled to controlling weight, it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not contradicted by other substantial evidence. 20 C.F.R. § 404.1527(c)(2); *see also Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). Without corroborating objective evidence, Heinsen severely downplayed Lloyd's capacity to sit, walk, and stand. Indeed Heinsen reported on several occasions that Lloyd had normal gait, and Lloyd's foot x-rays showed a healed fracture and no degenerative changes. A Doppler ultrasound confirmed a blood clot, but arterial problems surfaced inconsistently and no

consistent treatment occurred. Yet Heinsen opined that Lloyd could walk only half a city block without pain. Heinsen also did not corroborate his assertion that Lloyd was "totally and permanently disabled." In addition to the findings already discussed, Lloyd had normal chest x-rays, a slightly abnormal pulmonary test, and normal respiratory and cardiovascular exams.

Lloyd also argues that Dr. Jilhewar's opinion should not have received "considerable weight" because it is not consistent with other medical opinions. According to Lloyd, Jilhewar ignored the emergency-room trips for chest pain, the abnormal lung-function test, and Dr. Heinsen's lung-disease diagnosis. But far from ignoring these reports, Jilhewar diagnosed Lloyd with a lung disease, as Heinsen had, though he characterized it as "slight" because of the objective findings: the lung test was 1% below the normal ratio and chest x-rays showed no pulmonary or cardiac deficiencies. Additionally Jilhewar's opinion that Lloyd could perform light work was more consistent with both Dr. Coulter's and Dr. Mokadem's assessments (that Lloyd walked normally even with heel pain and that he could stand and walk for 2 hours in an 8-hour day) than was Heinsen's conclusion that Lloyd was totally disabled and could not walk even half a city block without stopping.

Lloyd next says that the ALJ erred by not explicitly assigning a level of weight to Dr. Mokadem's assessment of Lloyd, but this error was harmless because the ALJ thoroughly addressed Mokadem's overall findings, which were unfavorable to Lloyd. Mokadem found that Lloyd had a normal gait and posture, could stand on his heels and toes, and could squat and stand up from that position, all findings that undercut any serious limitations on walking, sitting, or standing.

Finally Lloyd sweepingly challenges the ALJ's decision as "cherry-picking" the medical opinion evidence that supported her pre-determined RFC and ignoring the favorable findings of Drs. Coulter, Heinsen, and Mokadem. But Lloyd bases his challenge on selective portions of these doctors' assessments. He points to Coulter's broad statement that he would have trouble with prolonged standing, walking, and climbing, but ignores Coulter's ultimate conclusion that he could perform sedentary work. Additionally he refers to Mokadem's findings that he had a reduced range of motion in his foot, diminished pulses in his left leg, and may have chronic arterial insufficiency as further favorable evidence, but overlooks Mokadem's findings that cut the other way. Lloyd next cites Heinsen's conclusion that he was totally and permanently disabled, which the ALJ determined deserved minimal weight because

Heinsen gave this opinion despite reporting at the contemporaneous physical examination that Lloyd had normal gait and respiratory and cardiovascular exams.

The ALJ's decision makes clear that she considered the entire record before settling on an RFC. She emphasized the physical examinations and the test results, but she also credited several of Lloyd's subjective complaints, leading her to impose "occasional" postural limitations and limit Lloyd to occasional exposure to pulmonary irritants. Because the ALJ examined the pertinent evidence and reached a conclusion substantially supported by that evidence, we see no basis for upsetting her determination.

AFFIRMED.